FILED
 2010 Jan-21 PM 02:11
 U.S. DISTRICT COURT
 N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| REBEKAH E. KOESTER,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| v.   ) | CIVIL ACTION NO. 08-G-2297-J |
| ) | |
| MICHAEL J. ASTRUE,   ) | |
| Commissioner of Social Security,   ) | |
| ) | |
| Defendant.   ) | |
| ) | |
| ) | |

## MEMORANDUM OPINION

The plaintiff, Rebekah E. Koester, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239..

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish her entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I). For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

>     (5)     whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers. Id.

In the instant case, ALJ Randall C. Stout determined the plaintiff met the first two tests, but concluded that while she has an impairment or combination of impairments considered "severe," she did not suffer from a listed impairment. In his decision, the ALJ found that the plaintiff has the residual functional capacity to perform a full range of light work. [R. 13]. Accordingly, the ALJ found the Plaintiff not to be disabled.

## THE STANDARD FOR REJECTING THE TESTIMONY OF A TREATING PHYSICIAN

As the Sixth Circuit has noted: "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988). "The testimony of a treating physician must ordinarily be

given substantial or considerable weight unless good cause is shown to the contrary." McGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); accord Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).  In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight ...."  McGregor, 786 F.2d at 1053.  If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law that testimony must be accepted as true.  McGregor, 786 F.2d at 1053; Elam, 921 F.2d at 1216.  The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence.  See McGregor, 786 F.2d at 1054; cf. Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## THE STANDARD WHEN THE CLAIMANT TESTIFIES SHE SUFFERS FROM DISABLING PAIN

In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms."  Foote, at 1560.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  In this circuit medical evidence of pain itself, or of its intensity, is not required.

> While both the regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself. Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the Hand standard a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself. See 20 CFR §§ 404.1529 and 416.929; Hale at 1011.

Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added). Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote at 1561. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, she must be found disabled unless that testimony is properly discredited.

When the Commissioner fails to credit a claimant's pain testimony, he must articulate reasons for that decision.

> It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

**FIBROMYALGIA**

Fibromyalgia presents unique problems in the context of Social Security cases. These problems have been recognized by the courts. In <u>Sarchet v. Chater</u>, 78 F.3d 305 (7th Cir. 1996), Chief Judge Posner examined fibromyalgia in detail:

> [F]ibromyalgia, also known as fibrositis—a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. <u>See</u> Frederick Wolfe et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 <u>Arthritis & Rheumatism</u> 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, <u>Current Medical Diagnosis & Treatment 1995</u> 708-09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. There is no serious doubt that Sarchet [the plaintiff] is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 <u>British Med.J</u>. 386 (1995); <u>Preston v. Secretary of Health & Human Services</u>, 854 F.2d 815, 818 (6th Cir.1988) (per curiam), but most do not and the question is whether Sarchet is one of the minority.

78 F.3d at 306-307. Other courts have also recognized that fibromyalgia can be disabling. <u>Kelly v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998)("Fibromyalgia, which is pain in the

6

fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling.").

In spite of its elusive nature, the presence of fibromyalgia can be objectively verified in some cases.  As noted in Sarchet, there are tender areas, or "trigger points," which are well defined and cause pain upon palpation.  Objective, clinical support for a diagnosis of fibromyalgia may also be present if injections of pain medication to the trigger points are prescribed.  Kelly at 589 (diagnosis of fibromyalgia is clinically supported by trigger point injections).  Clearly, then, fibromyalgia if properly diagnosed satisfies the pain standard.

## DISCUSSION

The plaintiff was 30 years old at the time of the ALJ hearing.  [R. 30].  In his decision, the ALJ found that the plaintiff suffered from the severe impairments of "degenerative disk disease of the lumbar spine with annular fissuring at L4-5 but no herniated disk; fibromyalgia; migraine headaches; hypertension; and a history of irritable bowel syndrome (IBS) . . . ."  [R. 12].  However, he found that the plaintiff's impairments do not "meet or medically equal one of the listed impairments. . . ."  [R. 13].  Although her original alleged onset date was February 6, 2000, at the hearing the plaintiff amended her alleged onset date to May 12, 2006.[1]  [R. 83].

---

[1] Because the plaintiff's last insured date for Title II disability benefits was March 31, 2005, the amendment of her alleged onset date to May 12, 2006, renders the plaintiff's application solely for Title XVI supplemental security income.

On November 13, 2007, the plaintiff's attorney took the deposition of Farouk Raquib, M.D., the plaintiff's treating neurologist. [R. 361-66]. Dr. Raquib testified that he is "in family practice as well as general neurology," adding that he is board certified in family practice. [R. 362]. Dr. Raquib first saw the plaintiff on November 7, 2005, and testified that he had since seen the plaintiff "[a]round 30 times." [R. 363]. Dr. Raquib's testimony included the following:

> Ms. Koester is a young lady with chronic pain. She has a condition called fibromyalgia, which is a chronic myofascial pain condition that is intractable and life long, followed by a chronic uncontrolled migraine, followed by a chronic lumbar pain related to degenerative disk disease, and anxiety and depression complicates [her] medical . . . illnesses.
>
> * * * *
>
> Fibromyalgia is a condition of muscle and ligaments, joints. A diagnosis is made following extensive investigation for other neurological conditions, and if none is made, then the diagnosis of fibromyalgia is made. Now, this condition is associated with severe chronic muscle pain, stiffness, poor sleep, depression, and of course, general debility to this condition.
>
> * * * *
>
> The condition is diagnosed clinically. You see the patient, and you analyze their [sic] symptoms, and you rule out other neurological conditions like lupus, rheumatoid arthritis, and other painful myofascial pain syndromes so you basically rule out other treatable conditions, and you're left with fibromyalgia.
>
> * * * *
>
> She has multiple pressure points and trigger points consistent with this diagnosis.

[R. 363-64]. Dr. Raquib testified that he had diagnosed that the plaintiff has fibromyalgia, confirming a diagnosis made by the Mayo Clinic in 2000. [R. 364]. The examination continued:

> Q: That [fibromyalgia], of course is her main chronic pain problem, but I would like to show you an MRI that was ordered by yourself back on December the 13th of 2005, and I'm sure you got a copy of it. I'm just showing it to you for your convenience.
>
> A: Yes.
>
> Q: And as a matter of fact, it looks like there was another MRI that you ordered that I will show you that is dated on October the 30th of 2006.
>
> A: Yes.
>
> Q: Would you compare and explain what the findings in each of those mean to you and relate those to the complaints that she makes?
>
> A: The MRI of [the] lumbar spine that was done on December 13, 2005 reveals degenerative disk disease, and basically, this means that the disks are drying out. They're losing their elasticity, and they're bulging. There is also a fissuring of one of the disks between L4 and L5 particularly. The picture here is a degenerative disease of [the] lumbar spine that is consistent with her symptoms of chronic lumbar pain.
>
> Q: I think there may be some additional findings in the October 2006 MRI, or are they essentially the same?
>
> A: I would call it essentially the same.
>
> Q: Are these findings significant enough in and of themselves to produce chronic pain?
>
> A: Yes.

Q: And would degenerative disk disease with findings compatible with these two MRIs, is this a problem exacerbated by obesity?

A: Yes.

* * * *

Q: She told me when I did a long interview with her back in February of this year that since she had filed this claim, which was May the 12th of 2006, that she had had migraines, and I asked her, and she broke them down into three categories of mild, moderate, and severe. She said she had mild migraines usually five times of month, moderate ones of say eight times a month, and severe ones, four to five times a month. The mild ones, she could cope with and not interfere with most activities. The moderate would usually be debilitating for a half a day, maybe up to a day, and the severe migraines, she just essentially went into her bedroom, closed the blinds, and these occurred by the way usually four to five times a month. Is that history in substance consistent with what she tells you?

A: Yes.

Q: I don't know if you got that recorded verbatim in your notes or not, but does that means that's not what she told you if you don't? Have you been writing down the frequency of the migraines in other words?

A: No.

[R. 364-65]. Dr. Raquib gave his opinion as to the plaintiff's impairments and their effect on possible absenteeism from work:

Q: Under the best circumstances that you can imagine in trying to manage her pain, do you know of any way that she wouldn't miss at least three to five days of work per month dealing with either migraines, fibromyalgia, or the lumbar disk disease, or all three of those?

A: That would be minimum.

10

> Q: And probably more?
>
> A: Yes.
>
> Q: And I've already asked you about the . . . specific elements, but she does seem to be a credible historian to you?
>
> A: Yes.
>
> Q: I take it that most people don't resort to going to the Mayo Clinic unless they're trying to get well?
>
> A: Correct.
>
> Q: Has she been regular and within reason compliant with the things you've asked her to do?
>
> A: Yes.  She is completely compliant.

[R. 366]. Dr. Raquib concluded his testimony by opining that he did not "think she can hold any kind of meaningful employment, and she will have life-long chronic pain, and she will be on analgesics for probably the rest of her life." [Id.].

The ALJ discounted Dr. Raquib's opinion, stating that an "examination of the medical evidence on which it was supposedly based fails in objective support." [R. 18].  This conclusion is not supported by substantial evidence.  Treatment records from Dr. Raquib support his deposition testimony.  On May 30, 2006, the plaintiff was seen by Dr. Raquib for follow up treatment for fibromyalgia, where she complained of severe pain of muscles with minimal activities.  [R. 360].  Dr. Raquib stated that the plaintiff's fibromyalgia was "poorly controlled." [Id.].  On June 28, 2006, Dr. Raquib saw the plaintiff for IBS, migraine headache and chronic lower back pain.  [R. 358-59].  On July

26, 2006, Dr. Raquib noted that her migraine headaches were poorly controlled. [R. 355-56]. On September 26, 2006, the plaintiff told Dr. Raquib her lower back pain was a seven on a scale of one to 10. [R. 351-52]. By October 28, 2006, her lower back pain was worse. Dr. Raquib noted that a December 2005 MRI showed an annular tear without any disc herniation at the L4/5 level. "Since then her pain has [gotten] significantly worse." [R. 349]. An October 30, 2006, MRI "showed mild broad based annular disc bulges and disc degenerative changes at the L4/L5 level." [R. 347]. Dr. Raquib prescribed Lortab 10 and Flexeril. [Id.].

A February 19, 2007, treatment note shows that the plaintiff's migraine headaches were increasing in frequency. [R. 342]. On May 17, 2007, and June 14, 2007, the plaintiff told Dr. Raquib that she was doing well on her current medications. [R. 335 and 337]. However, by July 19, 2007, she was complaining of "increasing fibromyalgia symptoms, i.e. generalized muscle pain, stiffness, poor sleep." [R. 333]. On September 13, 2007, Dr. Raquib noted her pain to be level 7, and he again prescribed Lortab 10 and Flexeril. [R. 329]. Because the ALJ failed to refute Dr. Raquib's testimony regarding the plaintiff's fibromyalgia, lower back pain, and migraine headaches, as a matter of law that testimony must be accepted as true.

In discounting the plaintiff's testimony in order to make a residual functional capacity finding of a full range of light work, the ALJ stated:

> The claimant testified that she lies down in a lounge chair in the course of
> an average day six or seven out of nine hours on bad days.

> \* \* \* \*
>
> In her Daily Activities Questionnaire, dated June 13, 2006, the claimant and her mother stated that she cooked dinner occasionally, but only easy dishes such as Hamburger Helper or grilled chicken. Still, this in consistent with the ability to use her hands, operate cooking appliances and use judgment. She went shopping once a month, sitting down at intervals; she could not carry groceries in if they weighed over ten pounds. This is consistent with the ability to go about in public, and to do some level of standing and walking. It also is consistent with the ability to make decisions and handle objects. She could not drive more than 15 minutes at a time because of leg pain. Driving, or riding with someone else, is consistent with the ability to perform sequential postural maneuvers to enter and exit a vehicle and to sit. Driving is also consistent with good use of the hands, operating some hand and foot controls, using judgment and maintaining attention and concentration. She showered and dressed in about 30 minutes, which was longer than the ten to fifteen minutes it took before her problems began (Exhibit 6E). These activities are consistent with the ability to stand for as much as 30 minutes, use her hands and perform manipulative activities to wash herself and to don clothing.

[R. 19]. The activities of daily living as recited by the ALJ, and as testified to by the plaintiff, do not support a finding that the plaintiff's pain testimony is not true. The ability to perform the limited activities noted by the ALJ does not rule out the presence of disabling pain. The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled. In this circuit it has been recognized that "participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability. Lewis v. Callahan, 125 F.3d 1346, 1441 (11th Cir. 1997). As has been noted:

> [S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. Similarly, shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two

>days.  Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well established that sporadic or transitory activity does not disprove disability.

Smith v. Califano, 637 F.2d 968, 971-72 (3rd Cir. 1981)(emphasis added).  It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances.  In Easter v. Bowen, the court observed as follows:

>Moreover, an applicant need not be completely bedridden or unable to perform any household chores to be considered disabled. See Yawitz v. Weinberger, 498 F.2d 956, 960 (8th Cir.1974).  What counts is the ability to perform as required on a daily basis in the "sometimes competitive and stressful" environment of the working world.  Douglas v. Bowen, 836 F.2d 392, 396 (8th Cir.1987) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)).

867 F.2d 1128, 1130 (8th Cir. 1989).  The Easter court further noted that "[e]mployers are concerned with substantial capacity, psychological stability, and steady attendance . . . ." 867 F.2d at 1130 (quoting Rhines v. Harris, 634 F.2d 1076, 1079 (8th Cir.1980)).

With this standard in mind, it is clear that the ALJ's articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence. Therefore, the ALJ failed to satisfy the requirements of Hale.  The conclusion of that court is equally appropriate in the instant case.  "[T]he Secretary has articulated reasons for refusing to credit the claimant's pain testimony, but none of these reasons is supported by substantial evidence.  It follows, therefore, that claimant's pain testimony has been accepted as true." Hale, at 1012.

Under this circuit's pain standard, objective proof of the pain itself is not required. Moreover, the medical evidence also shows a "longitudinal history of complaints and attempts at relief" that support the plaintiff's pain allegations. See SSR 96-7P 1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements."). As Judge Allgood observed in Lamb v. Bowen: "[T]he record is replete with evidence of a medical condition that could reasonably be expected to produce the alleged pain. No examining physician ever questioned the existence of appellant's pain. They simply found themselves unable to cure the pain." 847 F.2d 698 (11th Cir. 1988).

The ALJ also noted that:

> she has been evaluated most thoroughly at the Mayo Clinic, and that a multi-specialty evaluation resulted in advice from at least one of those physicians to engage in an exercise program including walking and stretching. There is no evidence that any physician has advised her to lie down during the day, and it may be that her habit of lying down nearly all day may have more to do with her sleeping problems than any pain or disability.

[R. 18]. Although the doctors at the Mayo Clinic did diagnose the plaintiff with fibromyalgia in 2000, reports from these examinations have little relevance, considering that the plaintiff's amended alleged onset date is May 12, 2006. Moreover, Dr. Raquib is a neurologist and a pain specialist, and found that the plaintiff meets the objective criteria

for fribromyalgia, based on clinical findings of multiple trigger points. Therefore, the ALJ's reasons for rejecting Dr. Raquib's opinion and testimony are not supported by substantial evidence; therefore, as stated above, Dr. Raquib's assessment must be taken as true.

## CONCLUSION

The Vocational Expert testified that pain of a moderately severe level and the need to lie down for extended periods throughout the day would preclude the ability to sustain any gainful activity. [R. 45-46]. Also, absenteeism of more than two days per month would not be tolerated, and would preclude any work. [R. 45]. Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work. Accordingly, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED 21 January 2010.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.